1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9   Cindy L. Cassino,                    )    No. CV-09-8217-PHX-MHM
                                         )
10            Plaintiff,                  )    **ORDER**
                                         )
11   vs.                                  )
                                         )
12                                        )
     Michael J. Astrue, Commissioner of Social )
13   Security Administration,             )
                                         )
14            Defendant.                  )
                                         )
15                                        )

16   _____

17

18         Plaintiff Cindy L. Cassino seeks judicial review of an Administrative Law Judge

19   ("ALJ") decision denying her claim for disability insurance benefits pursuant to 42 U.S.C.

20   § 405(g). Having reviewed the pleadings, the Court issues the following Order.

     **I.     Procedural History**

21         Plaintiff filed an application for Disability Insurance Benefits on May 19, 2005,

22   alleging a disability onset date of March 17, 2005 based on pain caused by shoulder and

23   knee injuries. Plaintiff also alleged that lower back pain and mental impairments

24   contributed to her disability. Plaintiff's claim was denied initially on July 6, 2005 and on

25   reconsideration on September 23, 2005 because it was determined that Plaintiff's

26   condition was not expected to remain severe enough for twelve consecutive months to

27   prevent her from working.  Plaintiff requested a hearing on November 2, 2005 before an

28

ALJ because she disagreed with the prior determinations on her claim. The hearing was held on March 27, 2007 before ALJ F. Keith Varni.  On June 6, 2007, the ALJ issued a Notice of Decision, denying Plaintiff's claims.

Plaintiff appealed the decision to the Appeals Council, which granted Plaintiff's request for review of the ALJ decision.  On May 23, 2008, the Appeals Council remanded the case to the ALJ to obtain evidence from a medical expert to clarify the nature and severity of Plaintiff's mental impairments, and to re-evaluate the opinion of a treating psychiatrist.

Accordingly, the ALJ held another hearing on February 9, 2009 and issued a new decision on July 10, 2009, finding again that Plaintiff was not disabled. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision final for purposes of judicial review under 42 U.S.C. § 405(g).

Plaintiff timely filed her complaint for judicial review in this Court pursuant to § 205(g) of the Social Security Act, 42 U.S.C. §205(g) on December 3, 2009. Plaintiff is requesting that the decision of the Appeals Council be reversed and remanded solely for calculation and awarding of disability benefits. Alternatively, Plaintiff requests the decision should be reversed and the matter remanded for a new decision in accordance with proper legal principles. Defendant filed an answer on February 24, 2010.  The issues have been briefed and are ripe for decision.

**II.    Standard of Review**

An ALJ determines an applicant's eligibility for disability benefits through a five stage analysis. The ALJ must:

    (1)    determine whether the applicant is engaged in "substantial gainful activity";

    (2)    determine whether the applicant has a "medically severe impairment or combination of impairments";

    (3)    determine whether the applicant's impairment equals one of a number of listed impairments that the Commissioner acknowledges

1
2
3
4
5
6

as so severe as to preclude the applicant from engaging in substantial gainful activity;

(4)     if the applicant's impairment does not equal one of the "listed impairments," the ALJ must determine whether the applicant is capable of performing his or her past relevant work;

(5)     and if the applicant is not capable of performing his or her past relevant work, determine whether the applicant "is able to perform other work in the national economy in view of his [or her] age, education, and work experience."

7    _Bowen v. Yuckert_, 482 U.S. 137, 140-41 (1987) (citing 20 C.F.R. §§ 404.1520(b)-(f)).

8    _See_ 20 C.F.R. § 416.920.

9          The Court must affirm an ALJ's findings of fact if they are supported by

10   substantial evidence and free from reversible legal error.  _See_ 42 U.S.C. 405(g); _see also_

11   _Ukolov v. Barnhart_, 420 F.3d 1002, 1004 (9th Cir. 2005).  Substantial evidence means

12   "more than a mere scintilla," but less than a preponderance, i.e., "such relevant evidence

13   as a reasonable mind might accept as adequate to support a conclusion."  _See_, e.g.,

14   _Sandgathe v. Chater_, 108 F.3d 978, 980 (9th Cir. 1997); _Clem v. Sullivan_, 894 F.2d 328,

15   330 (9th Cir. 1990).

16          In determining whether substantial evidence supports a decision, the record as a

17   whole must be considered, weighing both the evidence that supports and the evidence that

18   detracts from the ALJ's conclusion.  _See_ _Richardson v. Perales_, 402 U.S. 389, 401 (1971);

19   _see also_ _Tylitzki v. Shalala_, 999 F.2d 1411, 1413 (9th Cir. 1993).  Nonetheless, "[i]t is for

20   the ALJ, not the courts, to resolve ambiguities and conflicts in the medical testimony and

21   evidence."  _Andrews v. Shalala_, 53 F.3d 1035, 1039 (9th Cir. 1995) (citations and internal

22   quotation marks omitted).  Where evidence is inconclusive, "questions of credibility and

23   resolution of conflicts in the testimony are functions solely of the [ALJ]."  _Sample v._

24   _Schweiker_, 694 F.2d 639, 642 (9th Cir. 1982).  The ALJ may draw inferences logically

25   flowing from the evidence, and "[w]here evidence is susceptible to more than one rational

26   interpretation, it is the ALJ's conclusion which must be upheld."  _Id._ (citation omitted).

27   Regardless, "[i]f the evidence can support either affirming or reversing the ALJ's

28                                               - 3 -

1   conclusion, [then the Court] may not substitute [its] judgment for that of the ALJ."

2   Robbins v. Social Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006).  If on the whole record

3   before the court, substantial evidence supports the ALJ's decisions, the court must affirm.

4   Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989); 42 U.S.C. § 405(g).

5   **III.   Background**

6          Plaintiff Cindy Cassino is a high school graduate.  From 1979 to March of 2005,

7   Plaintiff  worked as a grocery store clerk.  She was 54 years old at the time of the alleged

8   onset of her disability on March 17, 2005.  Plaintiff's medical history is discussed below.

9          **A.   Medical History**

10                **1.   Shoulder Pain History**

11          In late 2004, Plaintiff began complaining of work-related pain in her neck,

12   shoulders, and left elbow (AR 313-26, see AR 268). An MRI of her left shoulder showed

13   "mild" osteoarthritic changes (AR 265, 268-69). Plaintiff initially received a conservative

14   course of treatment for the shoulder (see AR 275-312, 356-68). Eventually on March 23,

15   2005, an orthopaedic surgeon, Dr. Hiromu Shoji, operated on her shoulder (AR 333-45).

16   Within a week, her wound was "completely healed" and her shoulder had a normal

17   neurological status (AR 354). During 2005, Plaintiff continued to follow up with Dr.

18   Shoji, who generally noted that she had pain and some limited range of motion in the

19   shoulder, but was improving and had no neurological deficits (AR 347-53, 427-40).

20          In July 2005, because Plaintiff had applied for social security benefits, Dr. Thu Do,

21   a state agency physician, examined Plaintiff and found that she could: lift or carry 20

22   pounds occasionally and 10 pounds frequently; sit and stand/walk about six hours each in

23   an eight-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch,

24   crawl, and reach overhead with the left arm. Dr. Do also concluded that Plaintiff could not

25   climb ladders, ropes, or scaffolds (AR 370-78).

26          In November 2005, Dr. Shoji examined Plaintiff and found that she was at

27   maximum medical improvement. Dr. Shoji rated Plaintiff's left shoulder pain as

28                                                    - 4 -

"intermittent minimal pain which increases to slight occasionally," and said her cervical spine pain was "minimal . . . at most." He assessed a 3% whole person impairment rating for the left shoulder and none for her cervical spine, and recommended "prophylactic preclusion of repetitive pushing, pulling, reaching above the shoulder level" (AR 417-26).

### 2.     Fibromyalgia

In March 2006, Plaintiff began seeing internist Dr. Sarah Chae. Dr. Chae diagnosed Plaintiff with fibromyalgia and recommended exercise, and prescribed medications for pain and sleep (AR 403-04).  In April 2006, Plaintiff went to see Dr. Chae again and complained of a fibromyalgia flare, stating that she tried to go to work the prior week but had to go home due to body pain and depression. An examination showed positive fibromyalgia trigger points. (AR 400-01). In July 2006,  Plaintiff also complained to Dr. Chae of fibromyalgia pain and an examination showed "[p]ositive fibromyalgia trigger points" (AR 391-93).

In October 2006, Dr. Chae completed a Physical Residual Functional Capacity Questionnaire in which she  noted that Plaintiff had experienced "some improvement" in her symptoms of fibromyalgia (AR 328 -32). Dr. Chae said Plaintiff's pain and other symptoms would be "frequently" severe enough to interfere with the attention and concentration needed to perform simple work tasks and that Plaintiff was incapable of even low-stress jobs (AR 329). Dr. Chae did not complete the portion of the questionnaire regarding physical restrictions, stating "most of patient's debilitation is psychological" (AR 329-31).

On April 24, 2007, the agency sent Plaintiff for an orthopedic evaluation by Dr. Thomas Dorsey (AR 441-45). Plaintiff reported pain in her back, both shoulders, and both knees (AR 441). Exam revealed Plaintiff was in no acute distress and her regular gait, toe walk, and heel walk were normal. She had 15 pounds of grip strength in her right hand and 20 to 25 in her left (AR 443). She had normal range of motion except for reduced flexion in her lower back, pain on impingement testing of both shoulders, normal motor strength,

normal sensation in her extremities, and normal reflexes (AR 442-44). He found that, in an eight-hour day, Ms. Cassino could lift and carry up to ten pounds frequently and 20 pounds occasionally; sit for eight hours and stand and/or walk for six hours; and occasionally reach overhead with her left upper extremity but never climb ladders, ropes, or scaffolds or be exposed to unprotected heights (AR 446-50). Straight leg raise testing (to detect nerve root irritation in the low back) was negative (AR 443). Dr. Dorsey said Plaintiff could shop, travel independently, walk without an assistive device, walk a block at a reasonable pace, use public transportation, prepare a simple meal, care for her hygiene, and handle paper files (AR 451).

In May 2007, Plaintiff said that her fibromyalgia pain was "bad," and worst in her thoracic spine and shoulder blade. An examination was unremarkable except for positive fibromyalgia trigger points and tenderness along the mid-back (AR 498-500). Later, x-rays showed multi-level "mild" degenerative disc disease in the mid and lower thoracic spine (AR 506).  In October 2007, Plaintiff complained of low back pain sometimes radiating into her right leg, neck, and shoulder. Dr. Chae's examination showed no neurological deficits. She recommended a Doppler study of Plaintiff's legs (AR 495-97), which was normal (AR 505).

On October 3, 2008, Plaintiff drove herself to an appointment with Robertus Kounang, M.D., for a consultative orthopaedic examination requested by the Department of Social Services Disability and Adult Programs (AR 518-23). Plaintiff complained of left knee pain, bilateral wrist pain, neck pain, and mid and low-back pain (AR 518-19). Dr. Kounang noted that Plaintiff complained of "generalized body pain," but was in no acute distress and  that he saw "no significant abnormality on examination" (AR 522). He concluded Plaintiff could lift or carry fifty pounds occasionally and twenty-five pounds frequently; stand, walk, or sit for six hours each in an eight-hour workday; and occasionally kneel and crouch (AR 522).

1    In January 2009, Plaintiff requested that Dr. Chae complete paperwork for a

2  handicap sticker and her disability claim. Plaintiff said that she had diffuse body pain

3  causing difficulty with daily activities and an inability to work. An examination was

4  unremarkable except for fibromyalgia trigger points. Dr. Chae's diagnosis included

5  Arthritis, Fibromyalgia, and chronic fatigue and she referred Plaintiff to a Rheumatologist

6  (AR 561, 573-74).  Dr. Chae said Plaintiff could not do full-time work on a sustained basis

7  and could not perform even low stress jobs (AR 566).

8                          **3.    Psychological Issues**

9    In April 2006, Dr. Chae also noted that Plaintiff was severely depressed and

10  complained of sleep difficulties, but was not suicidal. At this time Plaintiff also

11  complained of a fibromyalgia flare, stating that she tried to go to work the prior week but

12  had to go home due to body pain and depression. Dr. Chae prescribed anti-depressant

13  (Lexapro) and anti-anxiety (Restoril) medications (AR 400-01).

14    In May 2006, Plaintiff complained of panic attacks, anxiety, and depression and she

15  said she could not work (AR 398-99).  Plaintiff said she remained very depressed and

16  anxious, could not focus, and cried frequently. Dr. Chae increased Plaintiff's Lexapro dose

17  and referred her to a psychiatrist, David Whitbread, M.D. (AR 396-97).

18    In June 2006, Plaintiff began treatment with Dr. Whitbread. Plaintiff said she had

19  anxiety and depression, but denied suicidal ideation or psychotic symptoms (AR 411-13).

20  In July 2006, Plaintiff told Dr. Chae that she had seen a psychiatrist and therapist, and felt

21  she was slowly improving. Plaintiff reported experiencing good and bad days though she

22  said she still felt anxious, cried daily, and had lost twenty pounds since January, which Dr.

23  Chae felt was a result of her depression (AR 391-93). Dr. Chae stated that Plaintiff's

24  depressive symptoms rendered her unable to perform her regular or customary work (AR

25  407).

26    On July 31, 2006, Dr. Whitbread noted that Plaintiff "tend[ed] to isolate" and had

27  "mild" agoraphobia, although she babysat her grandchildren at times (AR 411). Dr.

28                              - 7 -

1  Whitbread also completed Plaintiff's worker's compensation claim. He listed her diagnosis
2  as major depressive disorder and said that Plaintiff had been incapable of performing her
3  regular work since May 1, 2006, but felt she would be able to resume her regular work on
4  October 1, 2006 (AR 408-09).

5       When Dr. Chae completed a Physical Residual Functional Capacity Questionnaire
6  in October 2006, she noted that Plaintiff had experienced "some improvement" in her
7  symptoms of depression, and anxiety, but remained "very depressed" (AR 328).  Dr. Chae
8  said that Plaintiff's pain and other symptoms would be "frequently" severe enough to
9  interfere with the attention and concentration needed to perform simple work tasks and
10 that Plaintiff was incapable of even low-stress jobs (AR 329).

11      In November  2006, Plaintiff said she had been hospitalized for chest pain, which
12 turned out to be anxiety. Dr. Whitbread said that her depression was better, but that her
13 anxiety was worse with some agoraphobia (AR 471).

14      In April 2007, Dr. Whitbread completed a mental impairment questionnaire
15 and diagnosed Plaintiff with major depressive disorder, panic disorder with agoraphobia,
16 generalized anxiety disorder, and fibromyalgia (AR 475-480). He found her totally unable
17 to meet competitive standards with regard to her ability to remember work-like
18 procedures; maintain attention for two-hour segments; maintain regular attendance and be
19 punctual within customary tolerances; work with others without being distracted by them;
20 complete a normal workday or workweek without interruptions from her psychiatric
21 symptoms; deal with normal work stress; understand, remember, and carry out detailed
22 instructions; set realistic goals; deal with stress of semi-skilled work; and travel to
23 unfamiliar places (AR 477-78). Her physical pain and fatigue were also contributing to her
24 depressed and anxious mood (AR 477).

25      In May 2007, Plaintiff saw psychiatrist Reynaldo Abejuela, M.D., for a consultative
26 evaluation requested by the Department of Social Services Disability Evaluation Division
27 (AR 455-62). Plaintiff drove herself to the appointment (AR 455). Dr. Abejuela found that

28                                    - 8 -

1    Plaintiff had moderate impairment in daily activities and social functioning; mild to

2    moderate impairment in concentration, persistence, and pace; repeated episodes of

3    emotional deterioration in work-like situations; moderate impairment in handling simple

4    instructions; and severe impairment in handling complex instructions, responding to other

5    people, responding to usual work situations, and dealing with changes in a routine work

6    environment (AR 460-61). He found that her overall "occupational and social" impairment

7    was moderate to severe, and that Plaintiff was capable of handling her own funds (AR

8    461). On a separate form, Dr. Abejuela stated Plaintiff had "moderate" limitation in

9    understanding and remembering simple instructions and interacting with the public, and

10   that she had "marked" limitations in all remaining areas of work-related mental

11   functioning, including carrying out simple instructions and the ability to make judgments

12   on simple work-related decisions (AR 463-64).

13        In May 2007, Plaintiff told Dr. Chae that her depression and anxiety were "a little

14   bit better." And by October 2007, Plaintiff told Dr. Chae that her depression was better,

15   but that she still had some anxiety in social situations. (AR 495-97).

16        In October 2008, Plaintiff saw Romualdo Rodriguez, M.D, for a consultative

17   psychiatric evaluation requested by the Department of Social Security Disability and Adult

18   Programs  (AR 524-30). At this point, Plaintiff told Dr. Rodriguez that she was able to

19   care for her personal needs, pay bills, leave home alone, take care of household chores,

20   cook and make snacks, go to the store, and run errands (AR 526). Dr. Rodriguez

21   diagnosed her major depressive disorder in remission, said her condition was "stable," and

22   assessed a  Global Assessment of Functioning[1] ("GAF") score of 70 (AR 528-29). In a

23

24        [1]A Global Assessment of Functioning ("GAF") score is a snapshot of a condition at
     one point in time, and is not a longitudinal indicator of one's overall level of function. See
25   Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)
     (4th ed. 1994) (GAF provides an assessment of psychological, social, and occupational
26   functioning at one point in time). A GAF score of 61 to 70 indicates "[s]ome mild symptoms
     (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or
27

28                                              - 9 -

1  separate form, Dr. Rodriguez found that Plaintiff had only "mild" work-related mental

2  limitations (AR 531-33).

3      On October 21, 2008, Plaintiff saw an examining psychiatrist Ron Zodkevitch,

4  M.D. at the request of her attorneys.  (AR 535-48)  Dr. Zodkevitch diagnosed severe,

5  recurrent major depressive disorder without psychotic features; panic disorder with

6  agoraphobia; and psychological factors affecting a medical condition (AR 543). He

7  assessed a GAF of 45[2]. (AR 543) The only test Dr. Zodkevitch performed was the Beck

8  Depression Inventory, which showed evidence of severe depression (AR 541). Dr.

9  Zodkevitch concluded that Plaintiff was currently unable to work and was totally disabled

10  from a psychiatric standpoint and had been since July 2006 (AR 550-57). He listed

11  Plaintiff's diagnoses as severe Major Depressive Disorder and Panic Disorder with

12  Agoraphobia (AR 550).

13      In January 2009, as previously noted, Plaintiff requested that Dr. Chae complete

14  paperwork for a handicap sticker and her disability claim. Plaintiff told Dr. Chae she was

15  still very depressed which caused difficulty with daily activities and contributed to her

16  inability to work. At this time, Dr. Chae's diagnosis included depression and anxiety (AR

17  561, 573-74). Dr. Chae said Plaintiff could not do full-time work on a sustained basis and

18  could not perform even low stress jobs (AR 566).

19      In February 2009, Dr. Whitbread wrote a letter to Plaintiff's attorney stating  that

20  Plaintiff's symptoms rendered her "mostly housebound and socially isolated" (AR 576).

21  Dr. Whitbread said that "[i]nteraction with other people increases her anxiety and pain that

22  interferes with memory and concentration and focus resulting in impaired task completion

23

24  school functioning, but generally functioning pretty well, has some meaningful interpersonal

25  relationships." DSM-IV, supra, Note 4.

26      [2] A GAF of 41 to 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe

27  obsessional|rituals, frequent shoplifting) OR any serious impairment in social, occupational,
   or school functioning (e.g., no friends, unable to keep a job)." DSM-IV, supra, Note 4.

28

1    ability" (Id.). Dr. Whitbread concluded, "It is my opinion that [Plaintiff] suffers from

2    several chronic psychiatric and physical conditions that seriously interfere with her ability

3    to work in any type of employment. She is totally disabled at this time. This is probably

4    permanent" (Id.).

5           **B.     The Hearing Testimony**

6                  **1.     Plaintiff's Testimony**

7           At the administrative hearing in February 2009, Plaintiff testified that she last

8    worked sometime around 2006 (AR 90-103). Plaintiff said that she became unable to

9    perform even modified work because of problems with her feet and back that caused

10   difficulty standing (AR 94). Plaintiff said that she also experienced mental health

11   problems, including anxiety, depression, sleeping all the time, and not going anywhere

12   (AR 94, 95). Plaintiff said that she had difficulty concentrating, slept "all day," and did not

13   sleep well at night (AR 95). Plaintiff said that she began mental health treatment when Dr.

14   Chae referred her to Dr. Whitbread (AR 95) and that her mental health symptoms were

15   about the same as they were in 2006 (AR 96). Plaintiff said that she had good days and

16   bad days (AR 96). Plaintiff testified that her fibromyalgia caused pain "from head to toe"

17   (AR 96). Plaintiff testified she had a driver's license, but only drove short distances (AR

18   97-98) and that her husband did the shopping (AR 96).

19                 **2.     Vocational Expert Testimony**

20          At the administrative hearing in February 2009, the ALJ asked the vocational

21   expert to assume a hypothetical individual of Plaintiff's age, education, and work

22   experience with the following limitations: able to lift or carry fifty pounds occasionally

23   and twenty-five pounds frequently; able to stand, walk, or sit six hours in an eight-hour

24   workday; able to do occasional kneeling and crouching (AR 98-99 (citing AR 522)). The

25   vocational expert testified that such a person could perform the unskilled medium jobs of

26   hand packager, housekeeper, cleaner, and maid (AR 99).  He further testified that there

27   would be no jobs for someone who was off task twenty percent of the time or had

28                                        - 11 -

1   "marked" limitations in handling simple instructions and simple work-related decisions

2   (AR 101, 463-65).

3           **C.     The ALJ's Conclusions**

4           On February 9, 2009, the ALJ assessed Plaintiff's case following the five-step

5   sequential process for evaluating disability claims (AR 21-21). At step one, the ALJ found

6   that Plaintiff had not engaged in substantial gainful activity since the alleged onset of her

7   disability on March 2005 (AR 21, Finding 2). At step two, the ALJ found Plaintiff had the

8   following severe impairments: "a questionably severe impairment in the musculoskeletal

9   system involving the left shoulder and knee and a major depressive disorder" (AR 21-22,

10  Finding 3). At step three, the ALJ found Plaintiff did not have an impairment or

11  combination of impairments that met or medically equaled one of the presumptively

12  disabling impairments listed at 20 C.F.R. pt. 404, subpt. P, app. 1 (AR 22-23, Finding 4).

13          Contrary to what Plaintiff argued, the ALJ considered Plaintiff's fibromyalgia and

14  stated that Plaintiff's impairments could reasonably be expected to cause her alleged

15  symptoms.  However, the ALJ did not agree with the intensity, persistence, or the limiting

16  effects due to the Residual Functional Capacity Assessment, the fact that medications were

17  helpful for Plaintiff's conditions, and the Plaintiff's inconsistent statements regarding her

18  daily activities. The ALJ was not persuaded by the statements of Dr. Whitbred, Dr.

19  Abejuela, and Dr. Zodkevitch as to Plaintiff's depression since all of their medical

20  findings were based on subjective, self reported findings and are inconsistent with other

21  medical evidence.  The ALJ gave  the greatest weight to the testimony of Dr. Rodriguez,

22  because Dr. Rodriguez performed a recent, comprehensive examination of the claimant

23  and his opinion is supported by the results of his mental status examination.  The ALJ also

24  made an account of all the inconsistent statements made by Plaintiff.  For example,

25  Plaintiff said that she could not vacuum, mop, cook, or wash her hair because she could

26  not lift her arms.  However, she told the psychiatric examiner that she is able to take care

27  of household chores, cook, go to the store, run errands, and take care of her own personal

28

1   hygiene.  Plaintiff told Dr. Zodkevitch that her medications were not helping.  However,

2   she also in the same month told Dr. Rodriguez, that her condition was improving, and her

3   medications were helping her depression get better. After careful consideration of the

4   entire record, the ALJ found Plaintiff's subjective complaints regarding her psychiatric

5   conditions and physical conditions were not fully credible and that she had the residual

6   functional capacity to perform a range of "medium" work as defined in 20 C.F.R. §

7   404.1567(c), with the following restrictions:

8           • no more than occasional kneeling or crouching;

9           • only routine and repetitive, entry-level, minimally stressful work;

10          • no contact with the general public; and

11          • only superficial interpersonal contact with co-workers and supervisors

12   (AR 23-28, Finding 5). Based on vocational expert testimony, the ALJ found that Plaintiff

13   could not return to her past relevant work but that she could perform other jobs,  including

14   working as a packager, housekeeper, cleaner, or maid (AR 28-29, Findings 7-10).

15   Accordingly, the ALJ concluded Plaintiff was not disabled. (AR 29-30, Finding 11).

16   **IV.    Discussion**

17          Plaintiff appeals the ALJ's ruling on three different grounds.  First,  Plaintiff claims

18   that the ALJ erroneously failed to consider her fibromyalgia diagnosis. Second, Plaintiff

19   claims that the ALJ committed harmful error in rejecting the mental function assessments

20   of treating psychiatrist Whitbread and the examining psychiatrists Abejuela and

21   Zodkevitch. Third, Plaintiff contends that the ALJ failed to support his decision with

22   substantial evidence that Plaintiff's testimony lacks credibility.

23          **A.          Evidence Regarding Fibromyalgia**

24          Plaintiff questions the ALJ's rejection of the fibromyalgia diagnosis for three

25   reasons. First, Plaintiff claims that the record indicating the presence of positive trigger

26   points is sufficient to prove fibromyalgia. Second, Plaintiff claims that the ALJ applied the

27   wrong standard of proof to determine whether Plaintiff established the existence of a

28                                         - 13 -

1   medically determinable impairment. Third, Plaintiff claims that the failure of two

2   consultative examiners to endorse Dr. Chae's fibromyalgia diagnosis does not refute or

3   disprove the diagnosis.

4       Taking up Plaintiff's claim that the record supports a diagnosis of fibromyalgia, the

5   diagnosis of fibromyalgia is based on a history of pain in five parts of the body and patient

6   reports of pain when at least 11 of 18 points cause pain are palpated by the examiner's

7   thumb. Jordan v. Northrop Grumman Corp. Welfare Benefit Plan, 370 F.3d 869, 872 (9th

8   Cir. 2004), overruled on other grounds by Abatie v. Alta Health & Life Ins. Co., 458 F.3d

9   955, 969 (9th Cir. 2006), as recognized in Montour v. Hartford Life & Acc. Ins. Co., 588

10  F.3d 623, 626 (9th Cir. 2009); see also Brosnahan v. Barnhart, 336 F.3d 671, 672 n.1 (8th

11  Cir. 2003). In addition, the American College of Rheumatology require that the trigger

12  points be "painful at palpation, not just tender," a history of widespread pain for at least

13  three months, pain in both sides of the body, and pain above and below the waist with

14  axial skeleton pain. See http://www.nfra.net/Diagnost.htm, (Last visited May 21, 2010).

15      The fibromyalgia diagnosis in this case, however, is not fully confirmed by the

16  record. Dr. Chae's notes do not reflect all of the requisite findings to support fibromyalgia.

17  As previously noted, Dr. Chae's treatment notes intermittently reflect general findings of

18  positive fibromyalgia trigger points. More importantly, physical examinations by Dr. Chae

19  and other physicians show that Plaintiff did not have functional limitations from

20  fibromyalgia that would preclude the reduced range of medium work, regardless of the

21  amount of positive trigger points found and their locations. As a result, Dr. Chae opted not

22  to complete the physical limitation portion of a physical residual functional capacity

23  questionnaire because she felt Plaintiff's limitations were primarily "psychological." Dr.

24  Chae later affirmatively stated that Plaintiff had no limitations in lifting, reaching,

25  handling, or fingering. Therefore, even if Dr. Chae had provided sufficient documentation

26  for a fibromyalgia diagnosis, Plaintiff's fibromylgia did not preclude Plaintiff from

27  engaging in substantial gainful activity.

28

1    Plaintiff next argues that the law does not require proof of an impairment by

2 objective diagnostic criteria and that subjective complaints along with acceptable, albeit

3 subjective, diagnostic criteria by a medical professional may be sufficient. The claimant,

4 however, must show her impairments are so functionally limiting as to preclude any

5 substantial gainful activity. Barnhart v. Walton 535 U.S. 212, 217-222 (2002)..

6 Furthermore, the ALJ may discount a treating physician's opinions if he finds they are

7 based largely on a claimant's incredible subjective complaints without supporting medical

8 findings. See, e.g.,Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008) ("An ALJ

9 may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's

10 self-reports that have been properly discounted as incredible") (citations omitted); Batson

11 v. Comm'r. of the Soc. Sec. Admin., 359 F.3d 1195, 1195 n.3 (2004). The ALJ is

12 responsible for determining credibility, resolving conflicts in the medical testimony, and

13 resolving ambiguities.  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). An ALJ

14 may disregard the opinion of the treating physician if the ALJ sets forth specific and

15 legitimate reasons supported by substantial evidence in the record. Id. at  600-01

16    In this case, the ALJ's findings indicate that he considered Dr. Chae's opinions

17 regarding Plaintiff's fibromyalgia but did not give them great weight in light of the other

18 evidence presented.  The ALJ set forth the reasons why he found Dr. Chae's opinions

19 inconsistent with the other substantial medical evidence. For instance, Dr. Chae herself

20 noted in January 2009, that Plaintiff had no limitations on lifting, reaching, handling, or

21 fingering.   Moreover, medical examinations did not reveal functional limitations from

22 fibromyalgia pain that would preclude a range of medium work or preclude work activity

23 for at least 12 consecutive months.

24    Finally the Plaintiff argues that just because the two consultative examiners, Drs.

25 Dorsey and Kounang, did not agree with Dr. Chae's fibromyalgia diagnosis does not mean

26 that they refuted or disproved it.  Plaintiff argues that the consultative physicians are

27 orthopedic surgeons and not rheumatologists, and that they simply did not perform the

28                              - 15 -

1   necessary tests required to evaluate the existence of fibromyalgia. It bears mentioning,

2   however, that Dr. Chae is not a rheumatologist but rather an internist.  The limited basis

3   for Dr. Chae's fibromyalgia has already been discussed.  Furthermore, as Plaintiff stated in

4   her brief, "[f]ibromyalgia by its very nature is not susceptible to diagnosis by objective

5   testing."  Accordingly, Drs. Dorsey and Kounang performed tests to assess Plaintiff's

6   limitations and the amount of pain she was suffering from her alleged fibromyalgia.

7   Specifically, Dr. Kounang's examination showed that Plaintiff was in no acute distress and

8   that her impairments would not preclude her from performing a range of medium work.

9   Also, Dr. Dorsey's examination showed that, despite any pain Plaintiff may have been

10  experiencing, she was in no acute distress and retained the ability to perform a reduced

11  range of medium work.

12          Therefore, while Plaintiff experienced some stress and pain, these were not severe

13  enough to preclude her from performing a limited range of work.  The ALJ found the

14  opinions of Dr. Kounang and Dr. Dorsey regarding the extent of Petitioner's limitations

15  more credible than Dr. Chae's ultimate opinion about Plaintiff's limitations.  As previously

16  noted, The ALJ is responsible for determining credibility and resolving conflicts between

17  conflicting evidence.  Andrews, 53 F.3d at 1039. Based on the explanations provided by

18  the ALJ and the substantial evidence in the record, the Court finds that the ALJ adequately

19  considered but declined to accept Dr. Chae's ultimate opinion regarding Plaintiff's

20  limitations as conclusive.

21          **B.    Evidence Regarding Depression**

22          Plaintiff claims that the ALJ failed to consider the opinions of three physicians

23  regarding her depression, the treating physician Dr. Whitbread, and the consultative

24  physicians Drs. Abejuela and Zodkevitch.

25          The ALJ considered, but did not find conclusive Dr. Whitbread's opinion that Plaintiff

26  is housebound and socially isolated and that interaction with other people increases anxiety

27  and pain that interferes with her memory, concentration, focus and the ability to complete

28                                              - 16 -

1  tasks.  The ALJ stated that Dr. Whitbread's opinion on this point did not consist of medical

2  findings but was rather based on subjective, self reported symptoms.  Moreover, as the ALJ

3  pointed out, Dr. Whitbread's opinion was inconsistent with other evidence in the record,

4  including his own.  For example, in April 2007, Dr. Whitbread concluded that Plaintiff would

5  not be precluded from working with the general public and would have sufficient ability to

6  maintain socially appropriate behavior.

7         The ALJ agreed with Dr. Whitbread that Plaintiff's medically determinable

8  impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ

9  concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects

10  of these symptoms were not credible to the extent that they were not consistent with the

11  residual functional capacity assessment.

12         Plaintiff further argues that Dr. Abejuela's findings were not taken into consideration.

13  Dr. Abejuela found that Plaintiff had severe impairment in the areas of handling complex

14  instructions, responding to other people, responding to usual work situations, and dealing with

15  changes in a routine work environment.  The ALJ did take these findings into consideration,

16  however, Dr. Abejuela conducted his exam in May of 2007 and the ALJ considered the more

17  recent exam performed by Dr. Rodriguez in October of 2008 to be more pertinent.  See Fife

18  v. Dir. Office of Workers' Comp. Programs, 888 F.2d 365, 369 (3rd. Cir. 1989) (stating that

19  the older exam can be discounted by the more recent exam).  Dr. Rodriguez's findings showed

20  that Plaintiff's severe depression was in remission and that she had only limited social

21  impairments due to her psychological condition.  Plaintiff also told Dr. Rodriguez that she was

22  able to care for her personal needs, perform household chores, cook, go to the store, and run

23  errands. Moreover, the ALJ cited evidence indicating that Plaintiff's medications were helpful

24  in discounting her complaints of total disability, since the record indicated that Plaintiff

25  reported to Dr. Rodriguez that her medications were "very helpful." It was appropriate for the

26  ALJ evaluating the Plaintiff's claim to consider the progression of her condition in

27  determining whether she was entitled to benefits.

28

1    Plaintiff also claims that the ALJ failed to consider the opinion of Dr. Zodkevitch, who

2    concluded that Plaintiff was severely depressed, unable to work, and is currently totally

3    disabled from a psychiatric standpoint. As the ALJ explained, however, Dr. Zodkevitch's

4    opinion was based largely on Plaintiff's self-reports. Dr. Zodkevitch, who was retained by

5    Plaintiff's attorneys, stated that the only test he performed in reaching his conclusion was the

6    Beck Depression Inventory, which, by its nature, is a subjective measure of depressive

7    symptoms.  See Partee v. Comm'r of Soc. Sec., 2010 U.S. Dist. LEXIS 28262 (E.D. Cal)

8    (stating the Beck Depression Inventory merely asked the plaintiff to list subjective symptoms

9    and can not be said to represent objective clinical findings). Yet the same month that Plaintiff

10   told Dr. Zodkevitch that medications were not helping her depression and that she was unable

11   to cook vacuum, mop, or wash her hair, she told Dr. Rodriguez that she was able to take care

12   of her personal needs, cook, run errands, go to the store, and that her medications were very

13   helpful. It is within the ALJ's discretion to find Dr. Rodriguez' evaluation more credible than

14   Dr. Zodkevitch, particularly in light of the inconsistencies in Plaintiff's statements to both

15   doctors.  See Parra v. Astrue, 481 F.3d 742, 750 (9th Cir. 2007),  (citation omitted).

16   "It is for the ALJ, not the courts, to resolve ambiguities and conflicts in the medical

17   testimony and evidence." Shalala, 53 F.3d at 1039.  "If the evidence can support either

18   affirming or reversing the ALJ's conclusion, [then the Court] may not substitute [its]

19   judgment for that of the ALJ." Robbins, 466 F.3d at 882.  Given the explanations

20   provided by the ALJ regarding his reasons for giving greater weight to the opinion of Dr.

21   Rodriguez as well as the evidence presented, the Court does not conclude that the ALJ's

22   findings were unreasonable based on the record in this case.

23   **C.    The ALJ's Determination of Plaintiff's Credibility**

24   Lastly, Plaintiff argues that the ALJ failed to properly assess the credibility of her

25   subjective statements.  Generally, questions of credibility and resolution of conflicts in

26   evidence are functions solely for the [ALJ]. Id. An ALJ cannot be required to believe

27   every allegation of disabling pain, or else disability benefits would be available for the

28

1  asking. Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). Many medical conditions

2  produce pain not severe enough to preclude gainful employment. Id. An ALJ may discount

3  the claimant's subjective statements with clear and convincing reasons supported by

4  substantial evidence. Carmickle v. Comm'r. of Soc. Sec. Admin., 533 F.3d 1155, 1160

5  (9th Cir. 2008).

6       With respect to Plaintiff's impairments, the ALJ did not dispute the existence of

7  physical and psychiatric difficulties, only their severity.  The ALJ provided a number of

8  reasons for discounting Plaintiff's subjective claims about the severity of her ailments.  For

9  instance, the ALJ explicitly found that Plaintiff's allegations that she could not do

10  housework, cook, or wash her hair due to pain were inconsistent with information in the

11  record.   The record reflects that Plaintiff told Dr. Rodriguez that she was able to care for

12  her personal needs, take care of household chores, cook, go to the store, and run errands.

13  Plaintiff's claims concerning her physical limitations were also inconsistent with other

14  evidence of record, including Plaintiff's ability to care for her grandchildren on occasion

15  and drive to her medical appointments. In addition, the record reflects that Dr. Rodriguez

16  found that Plaintiff's severe depression was in remission and that she had only limited

17  social impairments due to her psychological condition.

18       Moreover, the ALJ cited evidence indicating that Plaintiff's medications were

19  helpful in discounting her complaints of total disability, since the record indicated that

20  Plaintiff reported to Dr. Rodriguez that her medications were "very helpful."  An

21  impairment which could reasonably be alleviated by medication or treatment could not

22  serve as a basis for a finding of disability. Crane v. Shalala, 76 F.3d 251, 254 (9th Cir.

23  1996).

24       The Court thus finds that, the ALJ provided clear and convincing reasons for

25  discounting Plaintiff's subjective statements, and the ALJ's credibility finding is supported

26  by substantial evidence.

27

28                              - 19 -

**V.      Conclusion**

When presented with conflicting medical opinions and subjective complaints, the ALJ must determine credibility and resolve the conflict based on the information in the record. These differences  and ambiguities were resolved by the ALJ in light of his review of the medical evidence and the testimony.  This Court does not conclude that the ALJ's determination was unreasonable based on a review of the record.

**Accordingly,**

**IT IS HEREBY ORDERED** affirming the Commissioner of Social Security's decision to deny Plaintiff's disability benefits.

DATED this 31st day of March, 2011.

_____
Mary H. Murguia
United States District Judge